**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **U.S. RING BINDER, L.P.** | |
| Plaintiff, | Case No. |
| **v.** | **JURY TRIAL DEMANDED** |
| **WORLD WIDE STATIONERY MANUFACTURING CO., LTD., and WORLD WIDE STATIONERY USA,** | |
| Defendants. | |

## COMPLAINT

U.S. Ring Binder, L.P. ("U.S. Ring") files this Complaint against World Wide Stationery Manufacturing Co., Ltd. ("World Wide Mfg") and World Wide Stationery USA (World Wide USA) (collectively "World Wide") for violation of United States antitrust laws and other related offenses.

## INTRODUCTION

U.S. Ring is a ring metal manufacturer based in St. Louis, MO. U.S. Ring also maintains manufacturing plants in China. U.S. Ring was founded over 80 years ago, and has survived and thrived as a ring metal manufacturer for the duration of its existence. U.S. Ring is an innovative, but relatively small, manufacturer of ring metals for notebooks or loose-leaf binders, which operates fairly and ethically within the ring metal market. U.S. Ring has never and does not currently strive to monopolize the ring metal market or operate with the purpose of eliminating its competitors. Rather, U.S. Ring is proud to be an upstanding company which provides excellent products and services to a smaller percentage of the ring metal market than a more dominant competitor.

World Wide Mfg is a ring metal manufacturer based in Hong Kong, China, and operates a subsidiary based in Fremont, Ohio called World Wide USA.  World Wide was founded just 30 years ago, and has moved quickly to become the highly dominant manufacturer of ring metals in the U.S. and throughout the world.  World Wide has a history of acting with the intent to weaken and remove its competitors from the ring metal market in order to gain an increasingly monopolistic presence in the market.  A competitor known as Hong Kong Stationery Manufacturing Co., Ltd. ("HKSM") was driven from the U.S. ring metal market due, in part, to threatening and bullying behavior by World Wide.  World Wide's recent activities, which involve illegally tying the sales of its unique ring metals to the sales of their commodity ring metals for individual customers, are yet another example of World Wide's desire to minimize its competition and gain a monopoly over the ring metal market.

World Wide's actions have threatened the very existence of its competitors, including U.S. Ring.  Accordingly, in order to protect against this anti-competitive and monopolistic behavior, and to avoid suffering a fate similar to that of HKSM, U.S. Ring has no choice but to file an antitrust complaint against World Wide.

## JURISDICTION

1.      This is an action for violation of antitrust laws pursuant to sections 2, 3, 4, and 16 of the Clayton Act (15 U.S.C. §§ 13, 14, 15, and 26), for private enforcement of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), as well as violation of the federal false marking statute (35 U.S.C. § 292).  The sale of World Wide's products is accomplished across state lines. World Wide's antitrust violations described herein have had, and are having, a substantial effect on interstate commerce.  This Court has jurisdiction over the federal law claims under 28 U.S.C.

§§ 1331, 1337, and 1338, and 15 U.S.C. §§ 15.  The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367 (supplemental jurisdiction).

2.      Venue is proper under 28 U.S.C. §§ 1391 and 1400(b).

3.      Defendant World Wide Mfg is a Chinese corporation with its principle place of business at 16/F.-19/F., Koon Wah Mirrors FTy., 3rd Industrial Building, 5-9 Ka Hing Road, Kwai Chung, New Territories, Hong Kong.  World Wide Mfg has committed antitrust violations, including monopolization and illegal tying agreements, as well as patent misuse, unfair competition, tortuous interference, false marking, and sham litigation against U.S. Ring and other like entities, in violation of the above listed statutes.

4.      Defendant World Wide USA is an American subsidiary of a Chinese Corporation, Defendant World Wide Mfg, with its principle place of business located at 1000 Wolfe Avenue, Fremont, Ohio 43420.  World Wide USA has committed acts of antitrust, including monopolization and illegal tying agreements, as well as patent misuse, unfair competition, tortuous interference, false marking, and sham litigation against U.S. Ring and other like entities, in violation of the above listed statutes.

5.      World Wide's actions constitute anticompetitive behavior in the United States, including in the Northern District of Ohio.

6.      This Court has personal jurisdiction over World Wide because World Wide has committed acts of antitrust in this district; does business in this district; and/or has systematic and continuous contacts in this district.

**BACKGROUND**

7.      U.S. Ring is a manufacturer of ring metals for the loose leaf binder industry and is based in St. Louis, Missouri.  The company designs, engineers and manufactures custom ring

metals and binders as well as dies, clips and other metals.  In addition to its production facilities in St. Louis, U.S. Ring also operates additional high-volume factories in China.

## BACKGROUND FACTS

### The Ring Metal Industry

8.      The ring metal industry consists of a supply chain that begins with relatively few ring metal manufacturers.  In the United States, the significant competitors are limited to two companies, U.S. Ring and World Wide.  These two companies control roughly 95% of the U.S. ring metal industry (World Wide - 80%; U.S. Ring - 15%).  There are no other significant competitors in the U.S. market.

9.      The ring metal manufacturers then sell ring metals to customers, known as binderies, who use the ring metals in the final binder products.  There are a few dominant bindery customers in the market, along with many smaller binders.  Bindery companies include, but are not limited to, Samsill Corp., ACCO Brands International, Inc., Avery Dennison Corp., and Cardinal Brands, Inc.  There are a highly limited number of customers in the U.S. to which manufacturers such as U.S. Ring and World Wide can sell ring metals.  The loss of a large customer, or a significant decrease in business with a large customer, carries the potential to inflict a severe and devastating injury on a ring metal manufacturer's ability to stay in business, particularly for a small ring metal manufacturer.

10.      The manufacturers' customers then sell completed products to retail outlets such as Staples, Walgreen's, Wal-Mart, Office Depot, Target, and other similar retail outlets.  Those retail outlets then sell the products to the end consumer.

11.      The industry currently operates in a fashion which allows a limited number of ring metal manufacturers to be successful, and it currently supports a very limited number of

binderies.  The number of retail outlets for the binderies to sell products to is quite large, which means that the loss of one or two customers would likely not have a profound effect on the binderies.  The reality for the ring metal manufacturers is quite the opposite.  If a small ring metal manufacturer is prevented from doing business with any of its significant bindery customers, or loses a significant portion of its business with any of those customers, the manufacturer faces extinction.

12.     The ring metal manufacturers compete in different product categories.  One category involves inventing and patenting innovative and unique products that the manufacturer would then have the exclusive right to sell to the binderies.  Another category is so-called commodity ring metals, which are not wholly unique to any one manufacturer.

13.     Furthermore, the ring metal industry, for the manufacturers, is a volume business. The manufacturers sell large quantities of ring metals to the binderies.  Due to the volumes that are bought and sold, the ability to be competitive is dependant on incredibly small price fluctuations, and differences charged are vital to a manufacturer's ability to make sales and survive.  As little as 1/8 to 1/4 of a cent difference between the different manufacturers' prices can dictate whether or not a deal is made.  Therefore, in the case of a smaller manufacturer, the ability to operate in a fair and honest market, which allows them to win contracts based on merit and prices, is vital to the smaller manufacturer's survival as a ring metal producer.  A smaller manufacturer will not be able to counter any leveraging of market power by a larger manufacturer that is unrelated to the quality and price of the ring metals.

14.     If a large manufacturer were to extinguish a smaller manufacturer's ability to sell commodity ring metals to specific customers, the action would prove highly detrimental to the small manufacturer and to competition in general.  Such behavior by a large manufacturer would

have the effect of pushing out smaller manufacturer competitors, thereby reducing competition,

creating a monopoly over the industry, and harming the general public.

### Relevant Market for Ring Metal Sales

15.     The sale of unique and commodity ring metals is a distinct product market.

16.     The geographic market for the sale of unique and commodity ring metals at issue

in this complaint is the United States.

17.     There is a relevant market for sales of both unique and commodity ring metals in

the United States.  The Relevant Market for Sales herein referred to is that which exists for

commodity ring metals ("Relevant Market for Sales").

18.     World Wide and U.S. Ring directly compete in the Relevant Market for Sales

throughout the United States.

### World Wide Market Share Dominance

19.     World Wide is the dominant ring metal producer in the ring metal industry in the

United States.  Either directly or through their exclusive distributors, World Wide currently

maintains control of approximately 80% of the Relevant Market for Sales in the United States.

U.S. Ring controls approximately 15% of the Relevant Market for Sales in the United States.

20.     This information establishes that World Wide and U.S. Ring are the sole direct

competitors in the U.S. ring metal market who control at least 95% of the Relevant Market for

Sales.  If U.S. Ring were to cease to exist, World Wide would have a monopoly over the entire

Relevant Market for Sales in the United States.

21.     World Wide is the dominant supplier of ring metals in the Relevant Market for

Sales in the United States.  Its position as the clearly dominant ring metal supplier gives it

leverage over its customers.  If World Wide suddenly decided to stop selling ring metals to its

customers, their businesses would be endangered.  World Wide's customers' dependence on it creates a situation in which the customers are at the mercy of World Wide's commands.

22.      World Wide's market position as the vastly dominant supplier of ring metals allows it to pressure customers into less than ideal, unethical, and illegal contracts with World Wide.

### World Wide's Patent Misuse and Abuse of the U.S. Patent Office

23.      World Wide has a history of promoting anti-competitive and monopolistic behavior through its misuse of patents and abuse of the patenting process as conducted by the United States Patent Office.

24.      World Wide attempts to take old ideas and patent incredibly narrow features of those old inventions.  World Wide creates and implements small variations on old ideas and subsequently seeks to patent those small changes.  In so doing, World Wide repeatedly floods the patent office with patents covering essentially the same invention.

25.      World Wide then uses the patents for relatively small or insignificant new features of old inventions as a basis for intimating to various binderies that it has the sole right to sell any and all ring metals that include those old ideas.  World Wide may have a patent on a relatively small feature of its version of an old product, but certainly it does not hold the sole legal right for manufacturing and selling those types of ring metals.

26.      An example of this practice concerns the so-called gap free feature, which involves the area in which the ring tips come together.  The gap free feature has been around for over 100 years and is demonstrable in many different patents that have been granted over those 100 years.  World Wide created and patented a small variation on the gap free feature, and then intimated to customers that it was the sole manufacturer of the gap free feature due to the very

narrow patent.  Due to World Wide's power in the industry, customers are forced to rely on such intimations, which caused some customers to take business away from other manufacturers due to a desire to obtain the gap free feature that the customers were led to believe was only available from World Wide.  Competing manufacturers have been and are being hurt by these practices adopted by World Wide.  It has an anti-competitive effect on the market by using a falsehood to drive customers away from competitors.

27.     The claims by World Wide insisting that it is the sole legal manufacturer of said products are false, malicious, incredibly harmful to its competitors, anti-competitive and expose its monopolistic goals.

**World Wide's Past Conduct with Hong Kong Stationery**

28.     Hong Kong Stationery Manufacturing Co., Ltd. ("HKSM") is a corporation organized and existing under the laws of China with a place of business at Unit 704-705, Tower A, New Mandarin Plaza, 14 Science Museum Rd., Tsim Sha Tsui East, Kowloon, Hong Kong, China.  HKSM is a designer and manufacturer of ring binder mechanisms, based in China, that has operated for the last 30 years.

29.     HKSM previously successfully operated within the borders of the United States and sold its ring metals to various U.S. customers.  In July of 2008, HKSM withdrew from the U.S. market and halted all ring metal supplying activities within the U.S.

30.     HKSM was a victim of World Wide's malicious and dishonest misuse of U.S. patents and abuse of the U.S. Patent Office.  The misuses and abuses are described in detail in paragraphs 23-27 of this complaint**.**  World Wide's abuses in this area inflicted a substantial amount of damage to HKSM's United States ring metal sales, contributing to their withdrawal from the United States market.

31.  HKSM withdrew from the U.S. market due to harassing acts as well as other actions by World Wide.  For example, in August of 2006, World Wide sued HKSM for patent infringement in United States District Court in the Eastern District of Missouri (Case No. 4:06-cv-01162-CAS).  The case was settled out of court.  This is an example of World Wide flexing its market dominance in order to frighten its smaller competitors into acquiescing to its wants and demands.  HKSM's size and relative U.S. market positioning left it ill-equipped to stand up to World Wide's harassment and bullying.  World Wide's actions drove HKSM out of the U.S. market, which only served to further World Wide's goal of monopolizing the U.S. ring metal market.  World Wide's August 2006 lawsuit serves as one example of its monopolistic and intimidating behavior towards smaller competitors.

32.  HKSM's ability to operate competitively in the U.S. market was directly harmed by World Wide's actions.  World Wide's behavior has resulted in a direct harm to the maintenance of a competitive market place in the U.S. ring metal industry.

**World Wide's Past Conduct with U.S. Ring**

33.  World Wide has a history of resorting to law evading tactics in order to advance its monopolistic agenda over the ring metal industry.

34.  In 2001, World Wide counter-sued U.S. Ring for patent infringement in United States District Court for the Eastern District of Missouri (Case No. 4:01-cv-0011-TCM).

35.  During the course of that litigation, U.S. Ring discovered and disclosed to counsel for World Wide prior art which showed that the World Wide patent at issue was invalid.

36.  Subsequent to the discovery of the prior art and the presentation of same to World

Wide, the claim was dropped and a settlement was reached.  World Wide's claims were shown to be without merit fairly and legally through the adjudicative process of the United States legal system.

37.     Following the settlement of World Wide's patent infringement suit in the U.S., The Chinese government forcefully shut down production of the ring metals which were at issue in the recently settled United States litigation at a U.S. Ring manufacturing facility in China. Additionally, World Wide took action in China in order to protect its ability to be the sole manufacturer of the product described in the invalid patent, thereby stymieing U.S. Ring's efforts to manufacture a legal product at its Chinese plant.

38.     World Wide's actions following the termination of its litigation in the U.S. were malicious, illegal and exposed its monopolistic aspirations in the ring metal industry.  It was denied protection, legally, in the U.S. for its patent due to the patent's invalidity, yet it performed an end around on the U.S. legal system in order to corruptly shut down a U.S. Ring manufacturing plant in China.  U.S. Ring had done nothing illegal, corrupt or malicious.  U.S. Ring merely defended its rights in a United States court of law in order to manufacture certain ring metals.  Conversely, World Wide proved its willingness to flaunt the laws of the United States, a country which allows it to operate within U.S. borders, by corruptly and unethically utilizing the Chinese government to forcefully injure the business dealings of a competitor.

39.     World Wide's actions highlight its willingness to perform devious, underhanded and corrupt actions in order to further its business interests at the expense of its competitor's well-being.  World Wide's actions gravely undermine its integrity.  The activities serve as a window into the ethical standards of World Wide business practices.  World Wide's actions

evidence a precedent for engaging in behavior meant to push out competitors and to further

World Wide's goal of creating a monopoly over the ring metal industry.

### U.S Ring and World Wide as Direct and Constant Competitors

40.     World Wide and U.S. Ring are direct competitors with a history of litigating over

specific patent infringement issues regarding ring metals.  The litigious history between the

entities supports the fact that the entities operate as direct competitors in the ring metal industry.

41.     Recently, World Wide and U.S. Ring have been involved in multiple lawsuits

concerning patent infringement issues.  The entities have acted as both plaintiff and defendant in

the suits.  The lawsuits commenced in July 2007 and April 2008, respectively, in United States

District Court, in the Eastern District of Missouri.

42.     World Wide and U.S. Ring have long been competitors in both the U.S. and

international ring metal markets, and that fact is supported by the history of the entities

commencing litigation against each other.

### World Wide's Tying Agreements with U.S. Ring Customers

43.     U.S. Ring has been verbally informed by a number of its customers of the

existence of contracts that the customers signed with World Wide which tied the ability to

purchase unique ring metals, specifically the One Touch Ring and One Touch 2 Ring, from

World Wide to an agreement to purchase a varying percentage, depending on the customer, of

the customer's commodity ring metals needs.  In other words, the customer was refused the

ability to purchase the World Wide One Touch Ring and One Touch 2 Ring unless it also agreed

to purchase a set percentage of its commodity ring metal needs from World Wide as well.  The

customer was obliged to make the commodity ring metal purchases from World Wide regardless

of whether or not World Wide maintained lower prices for the same commodity metals than U.S.

Ring or any other manufacturer.  The agreements allowed World Wide to reduce competition and increase prices charged for its ring metals.

44.    An example of one such illegal tying agreement is a contract that was entered into between World Wide and Avery Dennison Corp in 2007 which required Avery Dennison to purchase ninety (90) percent of its commodity ring metal needs from World Wide.  Otherwise, World Wide would not allow Avery Dennison to purchase the One Touch Ring. Similar contracts have been entered into between World Wide and other bindery customers, and the parties continue to maintain those contractual relationships.  These contracts directly affect competition in the Relevant Market for Sales.  Several key contract terms, such as price, quantity, and delivery schedule, are not fixed within the illegal tying agreements, but rather just require that a certain percentage of the customer's total ring metal needs be purchased from World Wide.  As such, the extent of the ongoing resulting damage done to World Wide's competitors, including U.S. Ring, was speculative at the time these contracts were entered into.

45.    As a direct result of these tying agreements, as stated to exist by World Wide's customers, U.S. Ring lost a significant amount of business with said customers.  U.S. Ring additionally suffered damage to their good reputation and customer goodwill as a result of World Wide's actions.  The loss of business from particular customers to U.S. Ring was significant and alarmingly sudden.

46.    World Wide damages U.S. Ring and the competition for commodity ring metal sales in the Relevant Market for Sales each and every time a purchase is made pursuant to World Wide's tying arrangement with its customers.

47.    The illegal tying of a certain percentage of commodity ring metal purchases to the purchase of World Wide's unique  ring metals accounts for the revenue lost by U.S. Ring.

48.     World Wide used its market power and industry leader status to induce customers to enter into tying agreements, which are illegal under Sherman Act § 1 (15 U.S.C. § 1).

49.     World Wide's conduct in regards to the illegal tying agreements is consistent with its past malicious, illegal and unethical actions which have been used to further its obvious goal of monopolizing the ring metal industry.

## World Wide's False Marking Activities

50.     World Wide manufacturers a line of ring metals known as the EZ Comfort series, and  has been marking the actual EZ Comfort ring metals as patented.

51.     The EZ Comfort series of ring metals is, in fact, not covered by any existing patents.

52.     World Wide's false marking activities are illegal under 35 U.S.C. § 292.  Each and every EZ Comfort ring metal which is falsely marked represents a separate violation of 35 U.S.C. § 292.

53.     World Wide's false marking of their EZ Comfort ring metals as being patented is consistent with the past malicious, illegal and unethical actions which have been consistently used to harm their competitors and advance their obvious goal of monopolizing the ring metal industry.

## World Wide's Sham Litigation Against U.S. Ring

54.     World Wide brought action against U.S. Ring for the alleged infringement of two patents, U.S. Patent No. 7,296,946 ('946 patent) and U.S. Patent No. 7,404,685 ('685 patent), in United States District Court, in the Eastern District of Missouri (Case No. 4:07-cv-1947).

55.      U.S. Ring filed counterclaims against World Wide asserting that the '946 and '685 patents were invalid due to anticipation of claims under 35 U.S.C. § 102 and obviousness under 35 U.S.C. § 103.

56.      On January 29, 2010, the U.S. District Court for the Eastern District of Missouri reached a verdict, ruling that U.S. Ring did not infringe upon the '946 patent or the '685 patent, and that both the '946 patent and '685 patents were invalid.

57.      World Wide knew that its infringement claims against U.S. Ring were baseless, as was demonstrated through the trial in this matter through a number of events and issues.  First, during trial the baselessness of World Wide's litigation was demonstrated through their lack of presentation of evidence to rebut U.S. Ring's invalidity case.  Second, the undisputed testimony from World Wide was that the '946 patent was invalid based on improper inventorship.  Third, World Wide presented little or no evidence on the issue of infringement and never presented the claims of the patents at issue to the jury during its case in chief.  Fourth, World Wide unreasonably pursued a claim for willful infringement when it was impossible under the law for it to succeed on such a claim.  Finally, World Wide vexatiously multiplied the proceedings and caused delays throughout the litigation process, due to its failure to adequately plan its presentation of evidence and to ensure that it could present evidence in the manner so desired at trial.

58.      The litigation action undertaken by World Wide against U.S. Ring was done with the intention of directly interfering with the business of U.S. Ring.  World Wide's litigation action against U.S. Ring was brought for the purpose of general harassment, consuming U.S. Ring's time, effort and financial resources, and to harm U.S. Ring's ability to sell its products to

customers by intimating to said customers that certain U.S. Ring products were infringing upon patents held by World Wide.

59.     The baseless litigation brought against U.S. Ring by World Wide is yet another example of World Wide's history of behavior meant to weaken and remove its competitors from the ring metal industry in order to create a monopoly in the Relevant Market for Sales.

## COUNT I: MONOPOLIZATION – SHERMAN ACT § 2

60.     U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 59 of these claims.

61.     World Wide has monopoly power in the Relevant Market for Sales.

62.     World Wide willfully acquired and maintains its market power.  World Wide's market power did not result from growth or development as a consequence of superior products, business acumen or historic accident.

63.     World Wide's conduct is a violation of the antitrust laws of the United States, including the Sherman Act (15 U.S.C. § 1 et. seq.), thereby entitling U.S. Ring to relief.

## COUNT II: ATTEMPT TO MONOPOLIZE – SHERMAN ACT § 2

64.     U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 63 of these claims.

65.     World Wide has acted as set forth above with the specific intent to monopolize the Relevant Market for Sales.

66.     There is a dangerous probability that World Wide will succeed in its attempt to monopolize the Relevant Market for Sales because World Wide controls a large percentage share of the Relevant Market for Sales and any success which World Wide has in excluding U.S. Ring

and other ring metal producers from the Relevant Market for Sales will confer a monopoly on World Wide.

67.     World Wide's conduct is a violation of the antitrust laws of the United States, including the Sherman Act (15 U.S.C. § 1 et. seq.), thereby entitling U.S. Ring to relief.

## COUNT III: ILLEGAL TYING ARRANGEMENT ("ONE TOUCH RING") (PER SE) – SHERMAN ACT § 1

68.     U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 67 of these claims.

69.     World Wide has in the past and is presently conditioning the sale of the One Touch Ring (the Tying Product) upon a customer's commitment to buy a significant percentage of their commodity ring metals needs (the Tied Product) from World Wide.  World Wide has made extensive use of an unlawful tying arrangement, and has thereby violated Section 1 of the Sherman Act (15 U.S.C. §1).

70.     Each transaction between World Wide and a customer pursuant to unlawful tying arrangement represents an overt act which constitutes a continuing violation of the Sherman Act (15 U.S.C. §1).

71.     The One Touch Ring is a unique product that is attractive and profitable to customers.  Only World Wide sells the One Touch Ring, and there are no reasonable substitutes.  The One Touch Ring is available only from World Wide, whereas the commodity ring metals are available from U.S. Ring and other manufacturers.  Moreover, the barriers to creating such substitutes are substantial.

72.     The One Touch Ring and the commodity ring metals are actually two separate and distinct products with separate relevant markets.  The Relevant market for Sales at issue here

is that for the sale of commodity ring metals.  The One Touch Ring and commodity ring metals are widely and publicly recognized as separate and distinct products, and many customers would prefer to purchase each product independently.

73.     World Wide has monopoly power over the sale of ring metals.

74.     World Wide's tying arrangement has been successful.  World Wide has by agreement or condition, express or implied, tied sale of its One Touch Ring to the purchase by a customer of a significant percentage of their commodity ring metals needs.  If World Wide had not imposed the tying arrangement, many of these purchasers would have bought a larger portion of their commodity ring metals needs from U.S. Ring or other ring metals producers.

75.     By imposing the tying arrangement, World Wide has (i) restrained and harmed competition in the Relevant Market for Sales of commodity ring metals; and (ii) foreclosed a substantial volume of commerce in the Relevant Market for Sales of commodity ring metals.

76.     World Wide's tying arrangement has caused injury to both buyers and sellers in the Relevant Market for Sales of commodity ring metals:

a.      Purchasers of the One Touch Ring from World Wide have been wrongfully forced to buy a larger percentage of their commodity ring metals needs from World Wide than they otherwise would have;

b.      World Wide's competitors have been wrongfully prevented from selling commodity ring metals to and fulfilling commodity ring metals needs for these purchasers;

c.      Prices for commodity ring metals have been higher than they would be in a competitive market.

77.     There is no appropriate or legitimate business justification for the tying of commodity ring metals needs to the purchase of the One Touch Ring from World Wide.  In any

case, this arrangement imposes excessive burdens, and any legitimate business purpose could be accomplished by less restrictive means.

78.　　U.S. Ring has lost, and continues to lose, profits and potential profits as a result of World Wide's tying arrangement.

## COUNT IV: ILLEGAL TYING ARRANGEMENT ("ONE TOUCH RING") (RULE OF REASON) – SHERMAN ACT § 1

79.　　U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 78 of these claims.

80.　　In the alternative, if World Wide's tying arrangement of additional commodity ring metal purchases to the One Touch Ring is not a *per se* violation of the Sherman Act, World Wide's tying arrangement unreasonably restrains competition and had an actual adverse effect on competition in the Relevant Market for Sales of commodity ring metals.

## COUNT V: ILLEGAL TYING ARRANGEMENT ("ONE TOUCH  2 RING") (PER SE) – SHERMAN ACT § 1

81.　　U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 80 of these claims.

82.　　World Wide has in the past and is presently conditioning the sale of One Touch 2 Ring (the Tying Product) upon a customer's commitment to buy a significant percentage of their commodity ring metals needs (the Tied Product) from World Wide.  World Wide has made extensive use of an unlawful tying arrangement, and has thereby violated Section 1 of the Sherman Act (15 U.S.C. §1).

83.　　World Wide has monopoly power over the sale of ring metals.

84.     Each transaction between World Wide and a customer pursuant to unlawful tying arrangements represents an overt act which constitutes a continuing violation of the Sherman Act (15 U.S.C. §1).

85.     The One Touch 2 Ring is a unique product that is attractive and profitable to customers.  Only World Wide sells the One Touch 2 Ring, and there are no reasonable substitutes.  The One Touch 2 Ring is available only from World Wide, whereas the commodity ring metals are available from U.S. Ring and other manufacturers.  Moreover, the barriers to creating such substitutes are substantial.

86.     The One Touch 2 Ring and the commodity ring metals are actually two separate and distinct products.  The One Touch 2 Ring and commodity ring metals are widely and publicly recognized as separate and distinct products, and many customers would prefer to purchase each product independently.

87.     World Wide's tying arrangement has been successful.  World Wide has by agreement or condition, express or implied, tied sale of its One Touch 2 Ring to the purchase by a customer of a significant percentage of their commodity ring metals needs.  If World Wide had not imposed the tying arrangement, many of these purchasers would have bought a larger portion of their commodity ring metals needs from U.S. Ring or other ring metals producers.

88.     By imposing the tying arrangement, World Wide has (i) restrained and harmed competition in the Relevant Market for Sales of commodity ring metals; and (ii) foreclosed a substantial volume of commerce in the Relevant Market for Sales of commodity ring metals.

89.     World Wide's tying arrangement has caused injury to both buyers and sellers in the Relevant Market for Sales of commodity ring metals;

a.      Purchasers of the One Touch 2 Ring from World Wide have been wrongfully forced to buy a larger percentage of their commodity ring metals needs from World Wide than they otherwise would have;

b.      World Wide's competitors have been wrongfully prevented from selling commodity ring metals to and fulfilling commodity ring metals needs for these purchasers;

c.      Prices for commodity ring metals have been higher than they would be in a competitive market.

90.     There is no appropriate or legitimate business justification for the tying of commodity ring metals needs to the purchase of the One Touch 2 Ring from World Wide.  In any case, this arrangement imposes excessive burdens, and any legitimate business purpose could be accomplished by less restrictive means.

91.     U.S. Ring has lost, and continues to lose, profits and potential profits as a result of World Wide's tying arrangement.

## COUNT VI: ILLEGAL TYING ARRANGEMENT ("ONE TOUCH 2 RING") (RULE OF REASON) – SHERMAN ACT § 1

92.     U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 91 of these claims.

93.     In the alternative, if World Wide's tying arrangement of additional commodity ring metal purchases to the One Touch 2 Ring is not a *per se* violation of the Sherman Act, World Wide's tying arrangement unreasonably restrains competition and had an actual adverse effect on competition in the Relevant Market for Sales of commodity ring metals.

## COUNT VII: PATENT MISUSE

94.     U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 93 of these claims.

95.     World Wide has wrongfully asserted that U.S. Ring is infringing certain of World Wide's patents.

96.     World Wide's assertions are objectively baseless.

97.     World Wide is misusing its patents and is: (a) attempting to expand the scope of any proper intellectual property monopoly in a manner that violates public policy; and (b) using anticompetitive conduct to restrict competition in the market for maintenance for ring metal sales.

98.     As a result of World Wide's actions U.S. Ring has been and is continuing to be damaged, and has suffered a loss of business and customer good will.

## COUNT VIII: STATE LAW ANTITRUST CLAIMS

99.     U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 98 of these claims.

100.     World Wide's activities set forth herein violate the antitrust laws of the various states where World Wide and U.S. Ring do business.

## DAMAGES RELATED TO WORLD WIDE'S ANTI-COMPETIVE ACTS IMPACT ON THE MARKET

101.     U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 100 of these claims.

102.     World Wide's acts and conduct have injured competition in the Relevant Market for Sales.  World Wide's acts and conduct threaten to (1) prevent U.S. Ring and other ring metal

producers from competing in the Relevant Market for Sales; (2) prevent purchasers of One

Touch Ring and One Touch 2 Ring products from contracting or continuing in contractual

relationships with U.S. Ring and with other similar situated ring metal producers; (3) drive U.S.

Ring and other similarly situated ring metal producers out of the Relevant Market for Sales; (4)

reduce the competition or improperly maintain a monopoly in the Relevant Market for Sales; (5)

reduce Customer choice in the Relevant Market for Sales; (6) increase prices in the Relevant

Market for Sales; and (7) cause a reduction in innovation for ring metals in the Relevant Market

for Sales.

103.    U.S. Ring has sustained the type of injury that the antitrust laws were intended to

prevent and that flows from the anticompetitive and exclusionary characteristics which make

World Wide's conduct unlawful.  U.S. Ring has been injured by World Wide's changes in their

policies and acts.  Prior to June of 2005, World Wide presumably did not have illegal tying

arrangements in place.  World Wide put those arrangements into place with the intent of

restraining competition and driving U.S. Ring out of the Relevant Market for Sales.

104.    As a direct and proximate result of World Wide's antitrust violations, U.S. Ring

has been damaged.  U.S. Ring has lost business, good reputation, and customer goodwill and it

has been prevented from entering into sales contracts and expanding its business.  Furthermore,

U.S. Ring is in imminent danger of continuing to lose its business until it is forced out of the

Relevant Market for Sales.  U.S. Ring has sustained substantial losses and damages to its

business and property in an amount which is presently undetermined.

## COUNT IX: UNFAIR COMPETITION

105.    U.S. Ring realleges and incorporates herein by reference all of the allegations

contained in Paragraphs 1 through 104 of these claims.

106.    World Wide's deceptive, unfair and/or unlawful acts, described above, constitute unfair competition.

107.    World Wide knowingly engaged in deceptive, unfair, and/or unlawful acts intending that such acts would harm competition in the Relevant Market for Sales and would injure U.S. Ring and other ring metal producers.

108.    As a result of World Wide's unfair and anticompetitive conduct, described above, competition in the Relevant Market for Sales has been injured.

109.    U.S. Ring has also suffered a loss of business as a direct result of World Wide's unfair and anticompetitive conduct, and World Wide has profited.

110.    World Wide has no legitimate business justification whatsoever for its unfair business practices.

## COUNT X: INJUNCTIVE RELIEF

111.    U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 110 of these claims.

112.    World Wide's acts and conduct threaten to (1) prevent U.S. Ring from competing in the Relevant Market for Sales; (2) prevent purchasers and users of ring metals from contracting or continuing in contractual relationships with U.S. Ring and without similarly situated ring metal producers; (3) drive U.S. Ring and other similarly situated firms out of the Relevant Market for Sales; (4) reduce competition or improperly maintain a monopoly in the Relevant Market for Sales; and (5) increase prices in the Relevant Market for Sales.

113.    Money damages alone will not suffice to remedy the irreparable harm that has and will be done to U.S. Ring as a result of World Wide's acts and conduct.  Moreover, U.S. Ring has lost and will lose substantial customer goodwill of incalculable value and will suffer a loss of

its good reputation.  Thus, U.S. Ring has no adequate remedy at law for World Wide's acts and conduct, because U.S. Ring will be forced out of the Relevant Market for Sales unless an injunction is granted.

## COUNT XI: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

114.     U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 113 of these claims.

115.     World Wide's conduct, described above, constitutes tortuous interference with prospective economic advantage.

116.     U.S. Ring has economic relationships with existing customers and potential customers that contain a probability of a future economic benefit to U.S. Ring.

117.     World Wide has been aware of these economic relationships.

118.     As described above, World Wide engaged in intentional and improper acts designed to disrupt these economic relationships without justification.

119.     World Wide's intentional and improper acts disrupted and interfered with U.S. Ring's economic relationships and will disrupt and interfere with U.S. Ring's economic relationships in the future.

120.     World Wide's conduct is willful, reckless, and malicious, making punitive damages proper to deter conduct in the future.

121.     As a result, U.S. Ring has been damaged and has suffered a loss of business and loss of goodwill.

### COUNT XII: COMMON LAW UNFAIR COMPETITION

122.     U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 121 of these claims.

123.     This cause for unfair competition and unlawful trade practices under the common law and statutes of the various states where World Wide and U.S. Ring have business relationships.  This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1338(b).

124.     After a reasonable opportunity for further investigation and discovery, U.S. Ring is likely to have evidentiary support that World Wide through their agents, employees and/or representatives has made false, deceptive or misleading and unfair descriptions of fact and/or misleading or deceptive representations of fact in connection with the sale of its goods.

### COUNT XIII: TORTIOUS INTERFERENCE WITH U.S. RING'S CONTRACTS BY WORLD WIDE

125.     U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 124 of these claims.

126.     This count is for tortuous interference with contracts existing between U.S. Ring and U.S. Ring's customers, and U.S. Ring seeks damages and injunctive relief against World Wide, for among other actions, inducing the breach of U.S. Ring's contracts with its customers.

127.     U.S. Ring has valid contracts with its customers.

128.     World Wide knew or should have known of U.S. Ring's contracts with its customers.

129.    World Wide intentionally and without justification interfered with and caused the breach of U.S. Ring's contracts by entering into illegal tying arrangements with U.S. Ring's customers.

130.    U.S. Ring has been damaged by World Wide's tortuous interference with U.S. Ring's contracts with its customers.

131.    U.S. Ring is entitled to damages, specific performance and an injunction. Furthermore, World Wide's conduct was outrageous and showed evil motive and reckless indifference to U.S. Ring's rights.  Accordingly, punitive damages should be assessed against World Wide to punish them and to deter them and others from like conduct.

## CLAIM XIV: FALSE MARKING UNDER 35 U.S.C. § 292

132.    U.S. Ring realleges and incorporates herein by reference all of the allegations contained in Paragraphs 1 through 131 of these claims.

133.    World Wide has falsely marked its products in violation of 35 U.S.C. § 292.

134.    World Wide has marked its EZ Comfort ring metal product by listing the word "patent" on the EZ Comfort product.

135.    The EZ Comfort ring metal products manufactured and sold by World Wide, which list that the EZ Comfort product is patented, are unpatented articles under 35 U.S.C. § 292 with respect to any existing patents and have never been patented articles.

136.    World Wide did have and currently has knowledge that the EZ Comfort products manufactured and sold by World Wide are unpatented articles under 35 U.S.C § 292 with respect to any existing patents.

137.    As described above, World Wide has extensive experience in applying for and prosecuting patents in the United States Patent System, and engaging in litigation with regards to its patents.  World Wide lacks any appropriate or legitimate business justification for falsely marking its EZ Comfort product as patented other than to deceive the public and continue its pattern of anticompetitive conduct through abuse of the patent system as described above. These products have never been patented, so this is not a case of a mere oversight where the defendant has mistakenly failed to update the packaging of a product following a patent expiration.

138.    World Wide is attempting to draw business away from its competitors by falsely representing that they have the exclusive right to sell certain products and that its customers would be exposing themselves to liability by purchasing similar products elsewhere.  World Wide does not provide a patent number that can be easily searched in order to discover the veracity of its representations.  Such anticompetitive conduct is injurious to World Wide's competitors, its customers, and the public.  As such, World Wide has formed the requisite intent to deceive the public necessary to establish false marking of the EZ Comfort product under 35 U.S.C. § 292.

139.    World Wide has engaged in similar conduct with respect to other of its products, knowingly marking unpatented articles as patented or marking articles as patent pending when there is in fact no patent pending, including but not limited to, the World Wide ring metal mechanism included in the Mead 1-inch binder and folder extension sold at Walgreens, with the requisite intent to deceive the public necessary to establish false marking in violation of 35 U.S.C. § 292.

140.    As a direct and proximate result of World Wide's false marking violations, U.S.

Ring has been damaged.  U.S. Ring has lost business, good reputation, and customer goodwill

due to World Wide's false marking and violation of 35 U.S.C. § 292.

### COUNT XV: WORLD WIDE'S SHAM LITIGATION AGAINST U.S. RING

141.    U.S. Ring realleges and incorporates herein by reference all of the allegations

contained in Paragraphs 1 through 140 of these claims.

142.    World Wide's infringement suit against U.S. Ring brought in the United States

District Court, Eastern District of Missouri (Case No. 4:07-cv-1947), was objectively baseless at

the time the lawsuit was filed, and World Wide could not have had any realistic expectation of

success of the merits of its case.

143.    World Wide brought litigation against U.S. Ring and was motivated by a

subjective intent to abuse the litigation process and to directly interfere with the business of U.S.

Ring through the use of governmental process, rather than being motivated by intent to obtain

judicial relief.

144.    As a direct and proximate result of World Wide's baseless litigation and antitrust

violations, U.S. Ring has been damaged.

### PRAYER FOR RELIEF

WHEREFORE, U.S. RING respectfully requests this Court enter judgment against World

Wide as follows:

a.      Declare World Wide's conduct unlawful under sections 1 and 2 of the Sherman

Act (15 U.S.C. §§ 1 and 2), as well as under the state law claims alleged above;

b.      Preliminarily and permanently enjoin World Wide, as well as its officers, agents,

servants, employees, and attorneys and those persons in active concert or participation with

World Wide who shall receive actual notice of the Court's injunction, from continued engagement in those acts, forms of conduct and practices found to be illegal, as provided by section 16 of the Clayton Act (15 U.S.C. § 26; see also 15 U.S.C. § 4);

     c.     Award U.S. Ring actual damages.

     d.     Award U.S. Ring threefold its actual antitrust damages sustained as a result of World Wide's antitrust violations, as provided by sections 3 and 4 of the Clayton Act (15 U.S.C. § 15), and award U.S. Ring its actual damages or restitution and, as appropriate, three-fold its actual damages, sustained under the applicable federal and state law claims above;

     e.     Award U.S. Ring one-half of the maximum $500 fine for each false marking offense in violation of 35 U.S.C. § 292;

     f.     Award U.S. Ring its costs and reasonable attorneys' fees as provided by sections 3 and 4 of the Clayton Act (15 U.S.C. § 15), and as provided for under the applicable federal and state law claims above;

     g.     Award U.S. Ring its damages as a result of World Wide's unfair competition and tortuous interference with U.S. Ring's contracts;

     h.     Award U.S. Ring actual and punitive damages due to World Wide's willful and deliberate conduct in an amount that the Court finds fair and reasonable to deter future conduct by others;

     i.     Award U.S. Ring double the amount of damages to the value of U.S. Ring's property interest in U.S. Ring's proprietary information and business relationships with its Customers.

     j.     Require that World Wide make a full report to this Court of its compliance with the foregoing within thirty (30) days of judgment;

k.  Award U.S. Ring prejudgment and post-judgment interest;

l.  Grant U.S. Ring such other and further relief, at law or in equity, to which it may show itself justly entitled, including without limitation its costs and attorneys' fees.

DATED:  November 8, 2010                    Respectfully submitted,

                                            **THE SIMON LAW FIRM, P.C.**

                                            /s/ Anthony G. Simon
                                            Anthony G. Simon
                                            Timothy E. Grochocinski
                                            Timothy M. Cronin
                                            800 Market St., Ste. 1700
                                            St. Louis, MO 63101
                                            P. 314-241-2929
                                            F. 314-241-2029
                                            asimon@simonlawpc.com
                                            teg@simonlawpc.com
                                            tcronin@simonlawpc.com

                                            **Harris • Reny • Torzewski, LPA**

                                            /s/ Jay Harris
                                            Jay Harris
                                            Two Maritime Plaza, 3rd Floor
                                            Toledo, OH 43604
                                            T. (419) 243-1105
                                            F.  (419) 243-8953
                                            toledojustice@bex.net

                                            ***ATTORNEYS FOR PLAINTIFF***