IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| U.S. Ring Binder L.P., | Case No. 3:10 CV 2556 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| World Wide Stationery Manufacturing Co., Ltd., | |
| Defendant. | |

## INTRODUCTION

This matter is before the Court on the Motion of Defendant World Wide Stationery Manufacturing Co., Ltd. ("World Wide") to Dismiss Plaintiff U.S. Ring Binder L.P.'s ("U.S. Ring") Amended Complaint ("Complaint") for failure to state a claim upon which relief may be granted (Doc. No. 26).  The matter has been fully briefed (Doc. Nos. 27, 34 & 36).

As part of its Motion to Dismiss, World Wide filed a Notice of Constitutional Question with the U.S. Attorney General ("the Government") (Doc. No. 30).  The Government intervened, pursuant to Federal Civil Rule 5.1(c) (Doc. No. 47), and opposed the Motion to Dismiss (Doc. No. 48), defending the constitutionality of 35 U.S.C. § 292 ("False Markings Act").  World Wide replied (Doc. No. 49).  Thereafter, the parties stipulated to stay consideration of the constitutional challenge and related arguments until the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") disposes of a case in which the statute's constitutionality is likewise challenged (Doc. No. 52).  The

constitutional question, however, is dismissed as moot because World Wide's Motion to Dismiss the Complaint is granted on other grounds.

## THE COMPLAINT

The Complaint advances the following allegations in support of a variety of federal and state law claims.

U.S. Ring manufactures ring metals ("rings") for use in looseleaf binders (Doc. No. 11 at ¶ 7). World Wide, a Hong Kong-based firm with its primary U.S. office in Fremont, Ohio (*id.* at ¶¶ 3–4), is the dominant manufacturer of rings, controlling 80 percent of the domestic ring industry as compared to U.S. Ring's 15 percent share (*id.* at ¶ 8).

Ring manufacturers sell their products to binderies, which incorporate the rings into notebooks or looseleaf binders for sale to retailers (*id.* at ¶¶ 9–10). Both the ring and bindery markets support a limited number of competitors (*id.* at ¶ 11); indeed, U.S. Ring is World Wide's "sole direct competitor[]" (*id.* at ¶ 20). By contrast, binderies sell to many retailers, which, in turn, sell binders and notebooks to end consumers (*id.* at ¶¶ 10–11).

The Complaint divides rings into two relevant product markets (*id.* at ¶ 17), distinguishing between unique or patented products versus commodity rings (*id.* at ¶ 12). Commodity rings is the relevant market for antitrust analysis (*id.* at ¶ 17). As the name implies, demand for commodity rings is price-driven (*id.* at ¶ 13). The Complaint defines the geographic market for both unique and commodity rings as the United States (*id.* at ¶ 16).

U.S. Ring alleges that World Wide exploits its dominant position in the market to pressure binderies into "less than ideal, unethical, and illegal contracts" in violation of federal antitrust law (*id.* at ¶ 22). Specifically, World Wide only sells two of its unique ring products -- the One Touch Ring

and the One Touch 2 Ring (collectively "the One Touch Ring products") -- to binderies that agree to purchase a certain portion of their commodity ring requirements from World Wide regardless of price (*id*. at ¶ 43). U.S. Ring claims it experienced a significant decrease in commodity ring orders from customers subjected to World Wide's allegedly illegal tying agreements (*id*. at ¶ 45). Such agreements, according to U.S. Ring, violate Section 1 of the Sherman Antitrust Act under a *per se* theory (*id.* at ¶¶ 69, 82) or, in the alternative, the agreements unreasonably restrain competition under a rule of reason analysis (*id* at ¶¶ 80, 93).

In addition, World Wide is accused of "willfully acquir[ing] and maintain[ing]" monopoly power in the commodity ring market (*id.* at ¶¶ 61–62), and that World Wide's strategy is driven by a specific intent to monopolize the commodity ring market, an outcome that has a "dangerous probability" of success if U.S. Ring and other manufacturers are eliminated (*id*. at ¶¶ 65–66).

Furthermore, U.S. Ring alleges World Wide misuses patents and abuses the patent process by introducing small variations into existing ring metal products, patenting the modified product, and then representing to customers that World Wide possesses patent rights to both the new and old (unmodified) ring metal technologies (*id*. at ¶¶ 24–25). Based on these representations, customers purchase products incorporating the new and old technologies solely from World Wide, under the mistaken belief that World Wide maintains exclusive right to sell both products (*id*. at ¶ 26). World Wide further allegedly abuses the patent process by labeling certain of its products as patented technologies when, in fact, World Wide holds no patent for the product (*id*. at ¶ 51), a practice that violates the False Markings Act and harms World Wide's competitors (*id*. at ¶¶ 52–53). U.S. Ring offers the events leading to Hong Kong Stationery Manufacturing Co., Ltd.'s exit from the U.S. ring market as an example of World Wide's misuse and abuse of the patent process (*id.* at ¶¶ 28–32).

U.S. Ring also claims World Wide's conduct during and after two previous lawsuits, in which U.S. Ring was the opposing party, demonstrates World Wide's anti-competitive conduct. In 2001, World Wide filed a counterclaim against U.S. Ring for patent infringement (*id.* at ¶ 34), only to abandon this counterclaim and agree to a settlement of U.S. Ring's claims after U.S. Ring shared evidence of prior art. This evidence demonstrated World Wide's asserted patent was invalid (*id.* at ¶¶ 35–36). Thereafter, World Wide "corruptly and unethically utilizi[ed] the Chinese government to forcefully injure" U.S. Ring (*id.* at ¶ 38). Specifically, World Wide induced the Chinese government to shutter the Chinese facility that produced rings for U.S. Ring, and was the subject of World Wide's baseless patent infringement counterclaim (*id.* at ¶¶ 37–38).

Six years later, World Wide again filed claims against U.S. Ring for allegedly infringing two patents -- claims U.S. Ring answered by proving the supposed World Wide patents were, in fact, invalid (*id*. at ¶¶ 54–56). During trial, World Wide's claims were demonstrated as groundless after World Wide's own uncontested evidence established the improper inventorship of the disputed patents (*id.* at ¶ 57). Further, World Wide produced scant evidence on its infringement claims and no evidence to rebut U.S. Ring's invalidity counterclaims (*id.*). Finally, World Wide caused delays through poor litigation management and pursued a willful infringement claim that, as a matter of law, had no chance of success (*id.*). Such unwarranted claims were allegedly pursued with the intent of damaging U.S. Ring's business by, among other things, indicating to U.S. Ring's customers that the firm's products infringed on World Wide patents (*id.* at ¶ 58).

In addition to claims for violations of federal antitrust and patent law, U.S. Ring advances the following claims:

- Violations of state antitrust statues in "the various states where World Wide and U.S. Ring do business" (*id.* at ¶ 100);

- Unfair competition resulting from deceptive acts harming competition in the Relevant Market for Sales (*id.* at ¶¶ 106–08);

- A "count" labeled "injunctive relief" (*id.* at ¶¶ 111–13);

- Tortious interference with prospective economic advantage resulting from World Wide disrupting and capturing U.S. Ring's relationships with current and future customers (*id.* at ¶¶ 114–21);

- Common law and statutory unfair competition (*id.* at ¶¶ 122–24);

- Tortious interference by causing binderies to breach contracts they have entered into with U.S. Ring (*id.* at ¶¶ 125–31); and

- Relief for damage caused by World Wide's "sham litigation" (*id.* at ¶¶ 141–44).

## STANDARD OF REVIEW

Federal Civil Rule 8 demands that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The pleading standard does not require "detailed factual allegations," but it demands more than an unadorned legal accusation. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* Such conclusory allegations must be rejected, and only a complaint containing well-pled factual allegations that plausibly give rise to an entitlement to relief will survive demurrer. *Id.* at 1950.

## DISCUSSION

The Complaint contains six counts explicitly linked to Sections 1 and 2 of the Sherman Antitrust Act ("the Act"). U.S. Ring alleges World Wide has monopolized, or is attempting to monopolize, "any part of the trade or commerce among the several States." 15 U.S.C. § 2. U.S. Ring

5

also invokes the prohibition of "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States," 15 U.S.C. § 1, with respect to the alleged tying agreements under both *per se* and rule of reason analysis.

### Section 2 Claims

U.S. Ring argues World Wide has monopolized, or is attempting to monopolize, the commodity ring market. To state a claim arising from World Wide's alleged monopolization, U.S. Ring must adequately allege World Wide attained monopoly power in the commodity ring market through "anti-competitive or exclusionary means" as compared to the lawful accretion of monopoly power through, for example, superior products. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002). To survive this Motion to Dismiss with respect to its attempted monopolization claim, U.S. Ring must adequately allege that World Wide engages in anti-competitive practices with the specific design to establish a monopoly, and that such conduct poses a "dangerous probability of success." *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 932 (6th Cir. 2005).

#### *Geographic and Product Markets*

For both Section 2 claims, U.S. Ring must plausibly allege the existence of geographic and product markets in which the accomplished monopolist maintains monopoly power, or in which Plaintiff competes with the aspiring monopolist. *Id.*; *see also Potters Med. Cent. v. City Hosp. Ass'n*, 800 F.2d 568, 574 (6th Cir. 1986). The failure to allege a plausible product or geographic market necessarily would doom U.S. Ring's Section 2 claims. *See Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 530–31 (6th Cir. 2001) (affirming dismissal of complaint that failed to properly allege, *inter alia*, product market).

The geographic market constitutes the area of "effective competition" in which "consumers of a product or service can turn for alternative sources of supply." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999). Determining the product market requires allegations identifying products that are identical to, or substitutes for, the defendant's products. *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983). This interchangeability analysis turns on an assessment of the product uses and cross-elasticity of demand, "consumer sensitivity to price levels at which [the consumer] elect[s] substitutes for the defendant's product or service." *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 917 (6th Cir. 2009).

For its Sherman Act claims, U.S. Ring describes the United States as the relevant geographic market for both commodity and unique rings (Doc. No. 11 at ¶ 16). World Wide dismisses this alleged geographic market as conclusory. This Court disagrees. U.S. Ring specifically alleges that World Wide and U.S. Ring compete throughout the United States (*id.* at ¶ 18). When accepted as true, this Court cannot label as implausible an allegation that two firms, controlling 95 percent of a certain market, compete nationwide.

Next, the Complaint alleges distinct product markets for the sale of commodity and unique rings (*id.* at ¶ 15), but selects commodity rings as the relevant market for antitrust analysis (*id.* at ¶ 17). Thus, U.S. Ring alleges that World Wide has achieved, or is striving toward, monopoly power in the commodity ring market. World Wide argues that because U.S. Ring advances no allegations with respect to either the use of commodity rings or cross-elasticity of demand, this alleged product market is facially unsustainable. According to World Wide, no facts are alleged describing the uses of, or available substitutes for, commodity rings, much less the effect of product price increases on a consumer's likelihood to elect a substitute. World Wide further contends U.S. Ring does not

7

describe why unique and commodity rings should be treated as discrete product markets, as no allegations are advanced concerning the degree of competition or substitutability, if any, between the two purported product markets.

U.S. Ring responds by arguing commodity rings are clearly defined as "not wholly unique to any one manufacturer" (*id.* at ¶ 12). In other words, the circle U.S. Ring draws around the commodity ring market ends where it meets unique rings, like World Wide's One Touch Ring products.

But such allegations are not sufficient to make out a product market. Nowhere in the Complaint does U.S. Ring allege the absence of reasonable substitutes for commodity rings, or that barriers to creating such substitutes are substantial (*id.* at ¶¶ 71, 85). The Complaint is silent whether other products are not substitutes for commodity rings such that if World Wide were to attempt to use anti-competitive means to raise the price of commodity rings, binderies could not then purchase potentially less expensive unique rings from U.S. Ring or others.

Moreover, the Complaint references U.S. Ring's production of "custom ring metals" (*id.* at ¶ 7). No further mention is made of this specific product or other potential products, which this Court finds particularly significant because the Complaint also does not definitively divide the ring industry into only two "categories." Rather, among the "different product categories" in which ring manufacturers compete, "one category" consists of unique rings, while "another category" contains commodity rings (*id.* at ¶ 12). This enumeration of product categories does not purport to be exhaustive.

U.S. Ring bears the burden of alleging a plausible, reasonably defined market affected by World Wide's alleged anti-competitive behavior. *Worldwide Basketball and Sport Tours, Inc. v. Nat'l Collegiate Athletic Assoc.*, 388 F.3d 955, 962 (6th Cir. 2004). This Court has been told what

8

commodity rings are not, *i.e.*, patented rings, but such an assertion would be of little value to this Court when called upon to assess the anti-competitive effects of, for instance, World Wide's alleged exclusionary behavior in the commodity rings "market."

U.S. Ring counters that should this Court find that U.S. Ring failed to, among other things, properly define the relevant product market, such a finding would constitute the application of a "heightened" pleading standard (Doc. No. 34 at 8). However, whether a pleading standard is "heightened," and therefore improper when applied to allegations subject to Federal Civil Rule 8, depends on the baseline from which the pleading standard's rigor is assessed.

Having located U.S. Ring's proffered baseline, this Court concludes it is U.S. Ring's favored pleading standard that is inappropriate. In setting forth the so-called legal standard for reviewing this Motion to Dismiss, U.S. Ring specifically employs the "no set of facts" standard rejected by the Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007) ("The 'no set of facts' language has been questioned, criticized, and explained away long enough by courts and commentators, and is best forgotten as an incomplete, negative gloss on an accepted pleading standard: *once* a claim has been *stated adequately*, it may be supported by showing *any set of facts consistent with the allegations in the complaint*") (emphasis added). U.S. Ring does reference *Iqbal*, but only for the adage that a complaint must contain enough factual content to allow a court to draw the reasonable inference of a defendant's liability. *See Iqbal*, 129 S. Ct. 1949. But it is not enough for this Court to draw *any* inference from a complaint whose allegations could provide relief on *some* quantum of proven facts. Rather, a complaint's non-conclusory, factual allegations must demonstrate facial plausibility. *See id*. Plaintiff's description of the relevant pleading standard calls for less, and is thus rejected.

9

*Market Power Analysis*

Even assuming on re-pleading U.S. Ring could properly allege a relevant market, U.S. Ring's actual and attempted monopolization claims must fail. As discussed above, U.S. Ring must plausibly allege that through anti-competitive conduct, World Wide has attained, or is reaching for, monopoly power in the commodity ring market. Monopoly power is the ability to "control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). A plaintiff can establish monopoly power either through direct evidence of "the exercise of actual control over prices or the actual exclusion of competitors," or circumstantial evidence showing the defendant possesses a high share of the relevant market. *Re/Max Int'l, Inc.*, 173 F.3d at 1016. But a high degree of market share alone is not enough to establish the existence of monopoly power. Considerations of market share are only the starting point for monopoly power analysis. *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc. ("Am. Council I")*, 185 F.3d 606, 623 (6th Cir. 1999). The key question a court must resolve when faced with circumstantial evidence of monopoly power is whether the defendant has the ability to control prices in, or exclude competitors from, the relevant market. *Conwood Co., L.P.*, 290 F.3d at 783 n.2. At the early pleading stage, the inquiry becomes whether the dynamics of the alleged market plausibly could support the existence and exercise of monopoly power.

World Wide argues a high share of the commodity ring market does not directly lead to the potential existence of monopoly power; rather, other factors, such as market competitiveness, barriers to entry, or the number of market competitors, must accompany "commanding market share" to establish monopoly power. In this case, World Wide argues certain features of the commodity ring market, described in the Complaint, render implausible World Wide's actual or potential exercise of

10

monopoly power. Of particular note is the absence of market entry barriers which precludes a firm from charging supra-competitive prices and thereby injuring competition. If World Wide artificially inflated its prices, either U.S. Ring or an upstart firm could undercut the supposed monopolist by selling commodity rings at prices in tune with natural market forces.

U.S. Ring reiterates that because World Wide is the dominant manufacturer of rings, "elimination of [U.S. Ring] from the ring market in the U.S. would create a monopoly for [World Wide]" (Doc. No. 34 at 11).

However, U.S. Ring ignores the implausibility of monopoly power existing in the ring market described by U.S. Ring. Among other things, the Complaint describes a ring market containing large volume sellers and acutely price-sensitive buyers (Doc. No. 11 at ¶ 13). "As little as 1/8 to 1/4 of a cent difference between the different manufacturers' prices can dictate whether or not a deal is made" (*id*.). In this market, it is the binderies, not the ring manufacturers, who hold the upper hand. Whereas binderies sell to a "quite large" number of retailers, a ring manufacturer's loss of even one bindery's business could spell failure (*id*. at ¶ 11). There even appears to be room for small manufacturers, a term that presumably refers to firms other than U.S. Ring, to enter the market and win contracts for the sale of commodity rings through "merit and prices" (*id.* at ¶ 13).

This description directly conflicts with later conclusory paragraphs alleging "[i]f World Wide suddenly decided to stop selling ring metals to [binderies], their businesses would be endangered" because binderies depend on the availability of World Wide products (*id.* at ¶ 21). This assumes, of course, that U.S. Ring, other small manufacturers of rings, or new entrants to the ring market could not fill the gap left by World Wide in this scenario. But the Complaint does not sufficiently allege

11

existing or future sources of rings lack the capacity to expand output in response to World Wide's refusal to sell.

Coupled with the Complaint's description of a sharply competitive marketplace, the allegation that monopoly power does or could exist in the commodity ring market is not plausible. The allegation that "[i]f a large manufacturer were to extinguish [through anti-competitive means U.S. Ring's or] a smaller manufacturer's ability to sell commodity rings to specific customers, the action would prove highly detrimental to the small manufacturer and to competition in general" (*id.* at ¶ 14) is a mere truism. The question for monopoly power analysis is not whether charging supra-competitive prices or excluding competitors through anti-competitive practices would harm competition, but whether the purported monopolizer has, or could have, the ability to thus harm competition. *Conwood Co., L.P.*, 290 F.3d at 783 n.2.

In reaching this conclusion, this Court does not, and need not, accept World Wide's assertion that the absence of barriers to entry in the commodity ring market alone is enough to doom U.S. Ring's claim. World Wide cites to *Am. Council I* for the proposition that "even a firm holding a commanding percentage of the market cannot charge a price above the competitive price, for once it does, competitors will enter the market and undercut the firm's price." 185 F.3d at 623. This Court, of course, agrees with this statement, but notes that the court in *Am. Council I* prefaces this point by referring to the lack of entry barriers as "relevant" in market power analysis. *Id.*; *see also Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 789 (6th Cir. 2005) (describing entry barriers as among the "probative factors" of monopoly power).

Still, the presence or absence of entry barriers is an important factor in determining whether a complaint plausibly alleges the possibility of monopoly power existing in a given market. *See*

12

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Plaintiffs relying on market share as a proxy for monopoly power must plead and produce evidence of a relevant product market, of the alleged monopolist's dominant share of that market, and of high barriers to entry"); *United States v. Microsoft Corp.*, 253 F.3d 34, 82 (D.C. Cir. 2001) (holding that a firm cannot possess monopoly power in a market unprotected by barriers to entry); *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988) ("A firm with a high market share may be able to exert market power in the short run, but substantial market power can persist only if there are significant and continuing barriers to entry") (quotations omitted); *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1308 (M.D. Fla. 2001) ("[W]here entry barriers are low, market share does not accurately reflect the party's market power") (quoting *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 982–83 (2d Cir. 1984)). Indeed, in some circuits, the absence of entry barriers can bar a Section 2 claim. *See, e.g.*, *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'ns*, 108 F.3d 1147, 1154 (9th Cir. 1997).

Because this Court concludes U.S. Ring fails to allege with sufficient particularity the relevant product market, and fails to plausibly allege the potential exercise of monopoly power in the commodity rings market, this Court need not reach the question of whether World Wide acquired, or is striving toward, monopoly power through unlawful, exclusionary conduct. Counts I and II are dismissed.

**Section 1 Claims**

U.S. Ring alleges World Wide's use of tying agreements unlawfully restrains trade in violation of Section 1 of the Sherman Act. A seller employs a tying agreement when he "sell[s] one product [(the tying product)] but only on the condition that the buyer also purchases a different (or tied)

13

product." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958). But merely conditioning one product's sale on another's does not violate federal antitrust law. Instead, a defendant must employ the market power it possesses in the tying product market to force the purchase of a product that, but for the tying agreement, a buyer would have sought elsewhere or on different terms. *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34–35 (2006).

Here, U.S. Ring alleges that, for certain World Wide customers, purchase of commodity rings are tied to the purchase of two World Wide unique ring products -- the One Touch Ring and One Touch 2 Ring. U.S. Ring characterizes the One Touch Ring as profitable, without reasonable substitutes, available only from World Wide, and hemmed in from competition from other manufacturers by "substantial" barriers for creating substitute products (Doc. No. 11 at ¶¶ 71, 85). According to U.S. Ring, World Wide refuses to sell either One Touch Ring product to a bindery unless the bindery agrees to purchase a certain percentage of its commodity rings from World Wide, regardless of the price charged for the tied commodity rings (*id.* at ¶ 43). U.S. Ring provides Avery Dennison Corp. as one example of a firm subjected to World Wide's alleged tying agreements (*id.* at ¶ 44). U.S. Ring posits that World Wide's alleged tying agreements violate Section 1 under a *per se*, or, in the alternative, a rule of reason analysis.

Section 1 claims rooted in alleged tying agreements are only actionable under a rule of reason analysis, and therefore the *per se* Counts III and V are dismissed. Citing a string of cases after the Supreme Court's rejection of the presumption that *all* tying agreements worked anti-competitive effects in *U.S. Steel Corp. v. Fortner Enter., Inc.*, 429 U.S. 610 (1977), the Court in *Illinois Tool Works Inc.* explicitly held that, in cases involving a tying arrangement, "the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works Inc.*, 547 U.S. at 46. Moreover,

in light of legislative amendments repealing the statutory "patent-equals-market-power presumption," the Court rejected the view that a patent necessarily confers upon the patent holder market power in a given product market. *Id.* at 44–45.

In addition to the previously discussed critique of the Complaint's commodity ring market definition, World Wide argues U.S. Ring's tying product market definition is also improper. Specifically, World Wide contends U.S. Ring cannot limit the tying market to one product without additional factual allegations plausibly suggesting such a limitation is appropriate. World Wide also challenges the "unique" characterization of the One Touch Ring products as insufficiently pled because U.S. Ring offers no description of product uses or why the product lacks reasonable substitutes.

Like a Section 2 claim, a tying product market's boundaries are determined by those products that are "*reasonably* interchangeable by consumers for the *same purposes*" as the tying product. *Ky. Speedway, LLC*, 588 F.3d at 916 (emphasis added). Necessarily then, to restrict each tying product market to a single One Touch Ring product, U.S. Ring must plausibly allege that a consumer could not reasonably use any other product for the same purpose served by the One Touch Ring product.

For good reason, "[s]ingle brand products are, at a minimum, extremely rare." *Apple, Inc. v. Pystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008); *see also Green County Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004) ("In general, a manufacturer's own products do not themselves comprise a relevant product market."). A product market definition provides the context for, among other things, assessing the degree of market power a defendant exercises in that market. *Microsoft Corp.*, 253 F.3d at 81. Therefore, the fewer substitute products included in a market definition, all things being equal, the more likely a defendant's influence in that

15

market will approach monopoly power. However, it is not the mere control each firm maintains over its own product's price that constitutes illegal monopoly power, but rather the effect of each firm's conduct on competition within the relevant market. *See E.I. du Pont de Nemours & Co.*, 351 U.S. at 393 ("[O]ne can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power . . . is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.").

U.S. Ring's description of the relevant unique ring market suffers certain deficiencies much like the description of the commodity ring market. Aside from naming the One Touch Ring products and defining what these products are not, *i.e.*, commodity rings, the Complaint fails to provide any description of the product's functionality. Nor does the Complaint provide factual allegations supporting the conclusory assertion that the One Touch Ring products lack any reasonable substitutes. The Complaint does not allege, for instance, any features of the One Touch Ring products that prevent other rings from serving the same purpose. Without further factual refinement, this Court will not allow U.S. Ring to proceed to discovery on a conclusory market sketch that confers upon World Wide the unlawful ability to control prices in, and exclude competition from, an implausibly narrow product market containing *only* a product World Wide, presumably, has been granted the sole ability to sell.[1]

Yet the Complaint also alleges U.S. Ring and World Wide *do* compete in the product market containing the One Touch Ring products. According to the Complaint, ring manufacturers "compete

---

[1] Though the Complaint does not specifically allege the One Touch Ring products are patented, they are classified as unique rings, a product market that "involves inventing and patenting innovative and unique products that the manufacturer would then have the exclusive right to sell to the binderies" (Doc. No. 11 at ¶ 12).

16

in different product categories" (Doc. No. 11 at ¶ 12). Among these different product categories are "innovative and unique products," as well as "[a]nother category [of] so-called commodity ring metals, which are not wholly unique to any one manufacturer" (*id.*). Both "categories" are later designated as "distinct product market[s]" (*id.* at ¶ 15). The One Touch Ring products belong to the former category, or unique rings (*id.* at ¶ 43). Thus, the Complaint alleges in conclusory terms both that U.S. Ring -- or any other firm, for that matter -- does *not* compete with World Wide in the tying product market *and* that U.S. Ring and World Wide *do* compete in the unique ring market, which includes the tying products. Therefore, U.S. Ring's tying product market definitions are not only implausible, but also are self-contradictory.

At the pleading stage, this Court only may accept non-conclusory averments supported by factual allegations as true. *Iqbal*, 129 S. Ct. at 1940. Accordingly, "[b]ecause [U.S. Ring has] not nudged [its Section 1] claims across the line from conceivable to plausible" with allegations this Court can accept as true, these claims must be dismissed. *Twombly*, 550 U.S. at 570.

### U.S. Ring's Request for Leave to Re-Plead Federal Claims

U.S. Ring has requested leave to re-plead "with additional specificity" any claims this Court deems insufficiently pled (Doc. No. 37 at ¶ 3). This Court denies U.S. Ring's request for leave to re-plead the federal law claims. Even assuming U.S. Ring could cure the defects in its definition of the commodity ring market under the Sherman Act, the Complaint's description of that market's competitive dynamics cannot be amended to render plausible the possibility of monopoly power being exercised in that market without directly contradicting portions of the current Complaint. Likewise, removing allegations that U.S. Ring and World Wide directly compete in the "product category" and "distinct product market" that includes the One Touch Ring is necessary to even begin the process

17

of plausibly alleging a single-brand product market. Leave to re-plead would allow U.S. Ring the opportunity to supplement, not redact, the Complaint. As a result, no Sherman Act claim can be salvaged through further Complaint amendments.

### Claims Providing No Independent Grounds for Relief

Despite U.S. Ring's reference to its patent misuse claim as a "cause of action" in both the Complaint (Doc. No. 11 at ¶¶ 94–98) and its opposition brief (Doc. No. 34 at 15), World Wide correctly notes that each case relied on by U.S. Ring refers to patent misuse as an affirmative defense (Doc. No. 36 at 9 n.12). U.S. Ring provides no case accepting patent misuse as an independent grounds for relief, and this Court finds no such case. *See, e.g., Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1323 (Fed Cir. 2010) (describing patent misuse as an affirmative defense to a patent infringement claim). Not having filed a responsive pleading, World Wide, of course, has not asserted a patent infringement claim in this case.

Rather, U.S. Ring's patent misuse claim is offered, like the sham litigation claim, as an example of the alleged anti-competitive conduct by which World Wide violates federal antitrust law. (*See* Doc. No. 11 at ¶ 23) ("World Wide has a history of promoting anti-competitive and monopolistic behavior through its misuse of patents"); (*see also id.* at ¶ 59) ("The baseless litigation brought against U.S. Ring by World Wide is yet another example of World Wide's history of behavior meant to weaken and remove its competitors from the ring metal industry in order to create a monopoly in the Relevant Market for Sales."). Because this Court concludes U.S. Ring does not sufficiently plead the relevant product markets, and cannot plausibly plead the potential exercise of monopoly power in either product market, this Court does not, and need not, reach the sufficiency of allegations offered

18

as a demonstration of World Wide's supposed exclusionary behavior. Therefore, Counts VII and XV are dismissed.

Finally, Count X of the Complaint is styled "injunctive relief" (*id.* at ¶¶ 111–13). Despite World Wide's treatment of this "count" (Doc. No. 27 at 11 n.4), U.S. Ring in opposition does not reference an injunctive relief "claim." This Court need not cite to authority supporting the elementary proposition that injunctive relief is, as the name suggests, a remedy, not a standalone claim. Moreover, U.S. Ring properly requests injunctive relief elsewhere in the Complaint (Doc. No. 11 at 28). Count X of the Complaint is also dismissed.

### Supplemental Jurisdiction and Remaining Claims

Lastly, having dismissed U.S. Ring's federal claims, the Court declines to exercise supplemental jurisdiction over U.S. Ring's state law claims and dismisses the state claims without prejudice. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). This case is at the earliest stage and there is no judicial efficiency or economy in retaining those claims. Furthermore, because there is otherwise no remaining live case or controversy other than the stayed constitutional False Markings Act claim, that claim too is dismissed as moot, without prejudice.

### CONCLUSION

For the foregoing reasons, World Wide's Motion to Dismiss is granted. The Complaint is dismissed without prejudice.

IT IS SO ORDERED.

                                        s/ *Jack Zouhary*
                                        JACK ZOUHARY
                                        U. S. DISTRICT JUDGE

August 19, 2011